OMAHA & R. V. R. CO. v. HARRISON BROWN.

SAME v. ANNIE E. BROWN.

[FILED MAY 6, 1890.]

1. **Pleading**: AMENDMENT: COSTS. The district court may grant an amendment of a pleading before or at the trial, upon such terms as to payment of costs as may be just, and error will not lie unless there has been an abuse of its discretion.

2. **Railroads**: BRIDGES OBSTRUCTING STREAM: ACTION TRANSITORY. An action against a railway company for injuries to real estate which occurred in 1886 from an overflow of the Platte river, caused by the alleged negligent and wrongful construction of a railway bridge across said river, is transitory and need not be brought in the county where the cause of action arose. The act of 1889 is not involved in the case.

3. ———: ———: EVIDENCE. Where the testimony of the witnesses tends to show that the piers of the bridge were twenty

feet apart from center to center; that prior to the construction of the bridge, floods had occurred in the river overflowing the bottom lands, and that driftwood frequently, at such times, floated down the river and was liable to lodge against any obstruction, and that in the breaking up of the ice in each spring cakes of ice more than twenty feet square frequently floated down which could not go between the piers unless broken up, this testimony was proper for the jury to consider in connection with the testimony of experts in substance that the bridge at the time of its construction was a prudent, safe, and proper constructure.

4. ——: ——: ——: REVIEW. Both the district and supreme court in a proper case is clothed by the Code with power to review the findings of a jury and where the verdict is clearly wrong set it aside, but this power will not be exercised merely because a greater number of witnesses testify against a given state of facts than those that testify in favor thereof. In such case it is the duty of the jury to scrutinize the testimony of each witness and ascertain from the evidence what his means of knowledge were, together with his apparent truthfulness and impartiality, and the verdict will not be disturbed unless it is clearly apparent that the jury committed an error.

5. ——: ——: DAMAGES: WHO MAY SUE FOR. A purchaser of real estate holding the same by contract and being in possession may recover damages for injury to said land.

ERROR to the district court for Saunders county. Tried below before MARSHALL, J.

*J. M. Thurston,* and *W. R. Kelly,* for plaintiff in error.

*W. H. Munger,* and *E. F. Gray, contra.*

MAXWELL, J.

These cases are similar and for that reason were tried together in the district court and are submitted together in this court. Harrison Brown in his petition alleges:

"That the plaintiff's said lands, ever since the year 1875 and as in its natural condition, were and have been lower than the banks of said Platte river, and as well all the

land round about the plaintiff's said lands, for many miles, was and has been, ever since the year 1875, and as in its natural state, lower than the banks of said river; and plaintiff's said lands, and as well as the said land round about, ever since the year 1875, and as in its natural state, was and has been liable to be overflowed by any obstruction of the natural flow of the said river; that beginning in the fall of 1876, and finishing in the spring of 1877, the defendant, well knowing all of the foregoing facts, and with full knowledge of the plaintiff's said lands and the condition thereof and improvements thereon, and of the occupation thereof, as aforesaid, and against and contrary to notice and warning, did, negligently, unlawfully, wrongfully, and in violation of the rights of the plaintiff, construct and erect a railroad bridge on its said line of railroad, between the counties of Douglas and Saunders, in Nebraska, over and across the Platte river, for its exclusive use, at a point about one and a fourth miles above the plaintiff's said lands, in a northwesterly direction therefrom, the said bridge being so erected and constructed as to create an unlawful obstruction in said river, and to prevent the natural flow of ice and water therein, and to cause the natural flow of ice and water in the spring of the year to gorge, back up, and overflow the banks of said river and flow down the valley on the north side of said river over the said lands of plaintiff and thereby greatly injure and damage adjoining lands and property, and especially the said lands and property thereon of the plaintiff and the business of the plaintiff on his said lands carried on by him, as aforesaid; that by reason of the said bridge, and as well the approaches thereto, being so negligently, wrongfully, unlawfully, and improperly constructed and erected by said defendant as aforesaid, the said bridge and its approaches, on or about the 27th day of February, 1886, did so obstruct the natural flow of ice and water in said Platte river as to threaten an ice gorge and blockade at such

point, and thereby cause the ice and water in said river to break over the north bank thereof and to flow over the adjoining lands and especially the plaintiff's said lands, to the immediate injury thereof and to the injury and destruction of the plaintiff's said property and business thereon, all of which facts the defendant well knew at the said time of such threatened and impending overflow and damage.

"That notwithstanding such knowledge, and although notified of the then condition of said river, and of the obstruction and threatened overflow as aforesaid, and warned by them of the probable consequence of permitting such obstruction to remain, yet the defendant neglected and refused to remove said obstruction or to make a sufficient opening in said bridge or approaches to allow the ice and water of said river to flow in the natural channel thereof, which the defendant then could with little expense have done within one day's time, and before any considerable overflow was caused, or any considerable damage or injury had been done, with but slight injury to said bridge or approaches, and could thereby have prevented the formation of an ice gorge at said bridge, and the serious overflow and consequent injury and damage to the plaintiff that followed; that, as the direct, natural, and probable result of the wrongful, unlawful, negligent, and improper erection and construction of said bridge and the approaches thereto, as aforesaid, and as the direct, natural, and probable result of permitting said bridge and approaches to remain as an obstruction in said river as aforesaid, a large ice gorge at said last mentioned date commenced to form at said bridge and approaches, and so did form and continue for twenty-four days, of sufficient height and strength as to completely turn the entire flow of ice and water running in said river against, over, and through the said north bank of said river at said bridge, above the plaintiff's said lands, and so as to cause the said ice and water of said river to rush and flow with great force, depth, and violence over

the plaintiff's said lands, and the surrounding lands for many miles in extent, and so continue for twenty-four days, and until the pressure of ice and water against said bridge broke through and carried away a portion of the same, when said ice and water immediately receded and flowed down the natural channel of said river; that by reason of said ice and water being forced over and through said north bank as aforesaid, and the ice and water with great force, depth, and violence rushing and flowing over the plaintiff's said lands as aforesaid, and over the surrounding land as aforesaid, the plaintiff's said lands, and the land surrounding the same for many miles in extent, were inundated and overflowed for the space of twenty-four days, and thereby, and in consequence of said ice gorge and obstruction, and the said negligence and wrongful and unlawful and improper erection and construction of said bridge and approaches thereto, the plaintiff was greatly injured and damaged in this, to-wit: His said lands and the whole thereof were stripped of its soil over its entire extent, gullied out in places, in places ridged up, and in places dug full of deep holes and the whole covered with a deep deposit of sand, and the said cultivated farm land was rendered unproductive and the grass of said meadow and pasture thereon was killed and destroyed, his fencing on said lands, amounting to 880 rods of fencing, was broken down and washed away and destroyed, his dwelling house and its foundation thereon was flooded and injured and his tenement house thereon was washed away and destroyed, and his barn and storehouses, corrals, and water troughs were injured and destroyed, to his damage in these behalfs $3,530; his hay to the amount of ten tons thereon was washed away and destroyed, his buckwheat to the amount of forty bushels thereon was washed away and destroyed, his corn thereon to the amount of two hundred bushels in crib was wetted and destroyed, his carpets and household goods thereon were wetted, washed away and de-

stroyed, his potatoes and provisions for family use of the value of $50 thereon were wetted and destroyed, his tools and implements of the value of $10 thereon were washed away and destroyed, his firewood thereon of the value of $50 was washed away and destroyed, to plaintiff's damage in these behalfs $350; his horses to the number of three, his cattle to the number of fifty, and his hogs to the number of three thereon were, by reason of the flooding of his barns and corrals, forced out into the open country, in cold, snow, ice, and water, without regular care and feed and compelled to be so exposed for twenty-four days, and greatly reduced in flesh and conditions, and five of his said cattle and said three hogs were drowned and killed, to plaintiff's damage in these behalfs $400; his labor and expense in endeavoring to save and care for his animals and property and his family from the consequence of said overflow amounted to not less than $200 in value, to his damage in this behalf $200; and the plaintiff, in consequence of said overflow, was otherwise put to great expense, trouble, and inconvenience, and hardship, and that the plaintiff's entire damage and loss in the premises is $4,480."

He afterwards filed a motion to amend his petition "by crossing out the words and figures, to-wit, 'to plaintiff's damage in these behalfs, $2,500,' found in lines 8 and 9 on page 7 of the petition; and by crossing out the words and figures, to-wit, 'to plaintiff's damage in this behalf, $800,' found in lines 11 and 12 of the same page; and by crossing out the figures, to-wit, '$150,' found in line 19 of the same page, and by inserting by interlineation in place of said last mentioned figures the figures, to-wit, '$3,530,' in order to make one item of the same aggregated damages out of what is now stated in three items, because said three items, as now stated, comprise damages only to the entire tract of real property, and, as now stated, might lead to confusion in the evidence and verdict." This was objected to on behalf of the railroad company because

32

it states a new and different cause of action and is a de-
parture from the original cause.   The objection was over-
ruled, to which exceptions were duly taken.   The amend-
ment was not a departure and did not state a new cause of
action, and the right to permit the amendment to be made
was within the control of the court.   In case of surprise,
where an important amendment of a pleading is made on
the trial, the court has the power to continue the cause for
a time or to the next term of the court.   This power is
necessary and should be exercised where an important
amendment is made during the trial which requires new
testimony to support or defend, against which the adverse
party cannot then produce.   In the case at bar, however,
there is no claim of unfair treatment by the court, and the
amendment seems to have been without prejudice.

   The railway company, in its answer, admits the con-
struction of the bridge in question, but denies that "it
wrongfully, unlawfully, and in violation of the rights of
the plaintiff constructed said bridge, and alleges that it was
duly authorized by its charter under the laws of the state
to construct the same; defendant denies that said bridge
was so constructed as to cause an unlawful obstruction in
said Platte river, and to prevent the natural flow of ice and
water to gorge, back up, and overflow the banks of said
river; and defendant denies that said bridge was in any
particular defectively or insufficiently constructed, but on
the contrary avers that the same was a suitable, safe, proper,
and lawful structure, to be erected and extended over said
river in furtherance of defendant's power and authority to
build and operate a railway under its said charter over and
across said river; and defendant denies that said bridge in
any manner caused the said ice and water to back up and
overflow the land of plaintiff, and denies that plaintiff was
damaged in any way by reason of the construction or erec-
tion of said bridge and approaches, and denies that said
bridge or its approaches were negligently, wrongfully, or

improperly constructed; and defendant denies that said plaintiff was damaged as in said petition described, but alleges that if said plaintiff suffered damage as alleged from the overflow of said Platte river, or from the gorging of ice there, such overflow and gorging were the result wholly of natural causes and of the unprecedented high water and the heavy snow upon the headwaters of said stream and the rapidity with which the same melted, and the sudden breaking up of the immense quantity of ice in said river caused the gorge and overflow as aforesaid, and that such alleged damages resulted wholly from the elements or act of God, being causes over which the defendant had no control whatever, and were not in any way or in any particular caused by said defendant or any of its structures or erections connected with said railroad, or by the construction, management, or existence of said railroad bridge or approaches. And for further answer defendant says that a short distance above the said bridge across the said Platte river there are certain islands and sand bars; that at the time alleged in said petition the only gorge of ice in said river formed on said islands and sand bars and not at or near the said bridge; that the gorges of ice thus formed upon the sand bars and islands above said bridge caused the overflow complained of and the only overflow of said river at said time; that the overflow of said river thus caused by the gorges at the said islands and sand bars was the direct cause of the alleged damages of said plaintiff and all the damages that may have accrued to the said plaintiff or others in the vicinity of said gorge; and defendant says that there was no ice gorge formed at the bridge, but that a large amount of the water that overflowed the banks of said river above said gorge formed on the islands and sand bars as aforesaid, flowed around said gorges on the bottom lands and back into the channel of said river above said bridge and pursued its natural course under said bridge without hinderance or obstruction."

As a second defense, the statute of limitations is pleaded, and the third defense is that the cause of action accrued in Douglas county and the action is brought in Saunders county.

The pleadings in the case of *Annie E. Brown v. O. & R. V. R. Co.* are substantially the same as in the case above set forth, except as to the title of forty acres of land, which will be noticed hereafter.

At the commencement of the trial the attorney for the railway company objected to the jurisdiction of the court upon the ground that the action should have been brought in Douglas county, where the cause of action arose. The objections were overruled, to which exceptions were duly taken, and the ruling of the court is now assigned for error.

Sec. 51 of the Code provides that "Actions for the following causes must be brought in the county in which the subject of the action is situated, except as provided in section fifty-two: First—For the recovery of real property or of an estate or interest therein. Second—For the partition of real property. Third—For the sale of real property under a mortgage lien or other incumbrance or charge. * * *

"Sec. 52. If the real property, the subject of the action, be an entire tract and situated in two or more counties, or if it consists of separate tracts situated in two or more counties, the action may be brought in any county in which any tract or part thereof is situated, unless it be an action to recover the possession thereof. And if the property be an entire tract, situated in two or more counties, an action to recover the possession thereof may be brought in either of such counties; but if it consists of separate tracts in different counties, the possession of such tracts must be recovered by separate actions brought in the counties where they are situated.

"Sec. 53. An action to compel the specific performance

of a contract of sale of real estate may be brought in the county where the defendants, or any of them, reside.

"Sec. 54. Actions for the following causes must be brought in the county where the cause, or some part thereof, arose. First—An action for the recovery of a fine, forfeiture or penalty, imposed by a statute, except that when it is imposed for an offense committed on a river, or other stream of water, or road which is the boundary of two or more counties, the action may be brought in any county bordering on such river, water-course or road, and opposite to the place where the offense was committed. Second—An action against a public officer for an act done by him in virtue or under color of his office, or for a neglect of his official duty. Third—An action on the official bond or undertaking of a public officer.

"Sec. 55. An action, other than one of those mentioned in the first three sections of this title, against a corporation created by the laws of this state may be brought in the county in which it is situated, or has its principal office or place of business, but if such corporation be an insurance company, the action may be brought in the county where the cause of action, or some part thereof, arose.

"Sec. 56. An action against a railroad company, or an owner of a line of mail stages, or other coaches, for an injury to person or property upon the road or line, or upon a liability as a carrier, may be brought in any county through or into which the said road or line passes."

It will be observed that sections 51, 52, and 53 relate to the actions affecting the *title* to real estate, while section 54 relates to official bonds, acts done by an officer by virtue of his office, neglect of official duty, and fines, forfeitures, and penalties imposed by statute. Section 55 applies more particularly to ordinary corporations of the state having a principal place of business therein, and it is evident from other provisions of the statute, was not intended to apply to railway corporations, as section 56 authorizes an action

to be brought against it for an injury to person or property upon the road or its line, or upon a liability as a carrier, in any county through or into which the road or line passes. It is claimed by the plaintiff in error that this provision does not apply in an action for injury to property caused by the construction of a bridge in so negligent and unskillful a manner as to cause an overflow of water which causes the damages. Section 4, chapter 72, Compiled Statutes, provides that "Service upon railroad companies may be made as upon other corporations, or by leaving a copy of the summons, by the proper officer, with any station agent, ticket agent, conductor, or other officer of said railroad formed within the limits of this state, or left at their usual place of business within said county."

This is not an action *in rem*, nor for the recovery of real estate, nor in any manner affecting the title or possession thereof, and unless prohibited by statute there seems to be no valid reason why it should not be brought in any county where service could be had. At common law originally all actions were local (7 Coke, 1): "This created no inconveniency, for all men, being anciently *in decenna*, they were easily come at, the *decenna* being responsible for their appearance; but when the custom of the decennary began to wear off, men used to fly from their creditors; and this begot the distinction between local and transitory actions, the first relating to lands, which must be tried where the lands lie; the other, a debt or duty adhering to the person wherever he fled. (1 Bac. Ab. 78.)" (*Genin v. Grier*, 10 Ohio, 211.) Hence, under the common law, it was necessary to allege a place in reference to every traversable fact, and that place, wherever the fact occurred, was always charged as being within the county the cause was to be tried. (Bliss on Code Pleading, sec. 284.)

Under the Code, however, it is unnecessary, except in local actions, to state the venue. The Ohio and Nebraska Codes classify local actions: For the recovery of real

property or an estate or interest therein, for the partition of real property, for the sale of real property under a mortgage lien or other incumbrance or charge.   The Code of Kansas adds to the above: " or for the determination in any form of any such rights or interest."   The Arkansas and Kentucky Codes add to the classes enumerated in the Ohio and Nebraska Codes : "For an injury to real property."   The original New York Code provided for local trials in actions for the recovery of a penalty or forfeiture, imposed by statute, except when committed on a lake, river, or other stream of water situated in two or more counties, in which case it may be brought in any county bordering on such lake, river, or stream, and opposite to the place where the offense was committed; against a public officer or person specially appointed to execute his duties for an act done by him by virtue of his office, or against a person who, by his command or in his aid, shall do anything touching the duties of such officer.   This statute seems to have been copied in California, Florida, Indiana, Minnesota, Oregon, North Carolina, South Carolina, and Wisconsin. (Bliss on Code Pleading, sec. 286, and cases cited.)

It will be observed that in but two of the states named it is necessary to bring an action for an injury to real estate in the county where the cause of action arose, and in both of those states there is a provision that "if the offense for which the claim is made be committed on a watercourse or road which is the boundary of two counties, the action may be brought in either of them. (Note 10 to sec. 286, Bliss on Code Pl.)   So that even in the latter states, where the cause of action arose out of an obstruction in a river dividing two counties, the action could be brought in either.   The action is for an alleged wrong committed by the railway company, by reason of which the plaintiff below claims to have sustained damages, and such action, in the absence of a statute to the contrary, may be brought in any county where service may be had on the defendant.

The defense of the statute of limitations has already been decided in *O. & R. V. R. R. Co. v. Standen*, 22 Neb., 343, in which it was held that where a railway bridge is so negligently constructed across a river as to form an unlawful obstruction and become a nuisance by causing an overflow of the river, no right of action accrues to a landowner until he sustains an actual injury caused by such unlawful obstruction. That case was carefully considered, and the authorities for and against the proposition were diligently examined, and in our view the judgment is right and will be adhered to.

The attorney for the railway company contends that the verdict is against the instructions of the court in regard to the construction of the bridge. They are as follows:

"11. The jury are instructed that the gist of these actions is the charge of negligence and the want of proper care on the part of the defendant in the construction of its bridge across the Platte river; and although the jury may, from the evidence, believe that each of the plaintiffs have suffered damage on account of the overflow of the ice and water from the channel of said river, this is not of itself sufficient to entitle the plaintiff to recover; it must further appear from the evidence that such overflow was directly and naturally caused by the negligent and improper construction of the defendant's said bridge, as defined and explained in these instructions.

"12. The jury are instructed that the defendant was authorized by law to erect the bridge in question over the Platte river and to maintain the same in the operation of its line of railway, but it was the duty of the defendant to so construct said bridge as to permit the passage in the channel of said river of such quantities of ice and water as might reasonably be expected or anticipated at the breaking up of said river in ordinary years; it was also the duty of the defendant, in the construction of said bridge, to take into consideration, not only the rise and fall

of the river during the year, but such floods and freshets as occur annually or at longer periods or intervals, and which, from having been known to occur at such periods or intervals, might reasonably be expected to occur again.

"13. The jury are instructed that the defendant in these cases would not be liable for damages occasioned by the overflow of lands caused by an extraordinary flood or freshet, such as the defendant's company could not reasonably have anticipated and provided for in the construction of its said bridge, even though such damage may to some extent have been occasioned by such bridge being in and over said river.

"14. The jury are instructed that it was the duty of the defendant in planning and constructing said bridge to use and employ the engineering knowledge and skill at the time of the construction of said bridge then ordinarily practiced in the construction of such work, and to see to the practical application of such knowledge and skill to the work of constructing said bridge; among other things, so as to allow the passage of ice and water, such as is known to pass in said river annually, or which may be reasonably expected to occur occasionally, without regard to such great or sudden overflows as are often designated as the 'acts of God.'

"15. The jury are instructed that if they, from the evidence, believe that the defendant did construct said bridge as stated and defined in the preceding instruction, then the defendant would not be guilty of negligence and would not be liable in these actions for the damages claimed. On the other hand, if the jury, from the evidence, believe that the defendant failed to execute and employ such reasonable and proper skill and care as stated and defined in said last preceding instruction, in the construction of said bridge, and that the overflow of the plaintiffs' lands was the direct and natural result of such failure, and that the plaintiffs suffered damage in consequence thereof, then the

defendant would be guilty of negligence, and would be liable in these actions.

"16. The jury are instructed that if they, from the evidence, find for the defendant on the question of negligence; that is, if they should, from the evidence, find that in the construction of its said bridge the defendant exercised reasonable skill, care, and prudence, within the definition already given, then it would be their duty to return a verdict for the defendant.  On the other hand, should the jury find from the evidence that the defendant did not exercise the reasonable and proper skill, care, and prudence in constructing said bridge, as hereinbefore defined in these instructions, the jury should next proceed to determine, from the evidence, whether an ice gorge formed at and against the said bridge, as the direct and natural results of its negligent, unskillful, or improper construction of said bridge, and should they, from the evidence, find that said gorge did form at and against said bridge, as the natural and direct result of defendant's negligence, or want of skill in the construction of said bridge, and that plaintiffs have been damaged in consequence thereof, they should then find in favor of the plaintiffs.   But should they, from the evidence, find that such gorge, if any, was due to any other cause or causes than the defendant's negligence, or want of skill and care in the construction of said bridge, they should find for the defendant, and in that case it would be immaterial what amount of damage, if any, the plaintiffs have sustained."

These instructions are not objected to as an incorrect statement of the law, but it is said, in effect, that the jury disregarded them by finding, as they must have done, that the bridge was negligently constructed.

The railway company called a number of witnesses who had been engaged in the planning and supervision of bridges over the Platte and other large rivers.   The testimony of these witnesses is given in a plain, direct, and

intelligible manner, apparently without reserve, and certainly is entitled to great weight. They testify, in substance, that the bridge in question, at the time it was constructed, was a prudent, safe, and proper structure. They frankly admit, however, that with their present knowledge of the river it would not be so considered, so that the railway bridge over the Platte river at Ashland has spans over the main channel of 102 feet each, and at Oreapolis the spans over the main channel have been lengthened to fifty or sixty feet each. The testimony also tends to show that with twenty feet spans there was in the lower part of the river liability to gorge when the river was breaking up in the spring.

The superintendent of one of the leading railroads in the state, who has superintended the construction of a number of railroad bridges over the Platte river, on cross-examination testifies :

A. If a truss bridge is put up it necessarily must be raised enough higher to give the clearance under the truss that you have under the stringers.

Q. That does not affect the question of the free flowage of the water and the ice, but simply a matter that affects the cost of the bridge, is it not?

A. It wouldn't make any difference in the cost of a bridge whether you raised it up or let it down, but it would probably go out if you let it down enough lower to keep your track at the same elevation as on a stringer bridge. Now, then, assuming that your stringer bridge is just high enough to clear the flow of water and ice, then with track of the same elevation on the truss bridge that you had on a stringer bridge your truss would probably be taken out by the ice.

Q. What is the objection to raising your track three or four feet higher, and putting a truss bridge under, the only objection is the expense of structure.

A. The cost of the structure and matter of operation

and safety; where a stringer bridge can be used it is very much safer than a truss bridge.

Q. Is it not practicable to build a safe bridge, a truss bridge with 150-foot spans?

A. Yes, sir.

Q. Now, what is the length of the spans of the bridge which your company has built under your supervision at Ashland?

A. The greater number of the spans are twenty feet; we have a few trusses in the main part of the channel.

Q. What length are they?

A. One hundred and two feet clear.

Q. What is the object of having those few spans that much longer in the center of the river?

A. That bridge is one that will be very important to us, and if we should have trouble in the spring of the year, a few days' delay to trains, which is possible to occur if we have only these twenty-foot spans, and are required to take care of them with a large force, it would be quite an objection.

Q. Is not this it, that those spans are put in a 100 feet and over in length because they will admit the flow of water and ice much easier than the twenty-foot spans?

A. Yes, sir; without care being bestowed upon them.

Q. To admit the flow of the ice and water through the twenty-foot spans it requires a good deal of care and a good deal of labor at times, does it not?

A. Yes, sir.

Q. You have observed ice as it came down the Platte river, have you not?

A. Yes, sir.

Q. How thick does the ice come down there occasionally?

A. It varies considerably; I have seen it in some cases eighteen inches, but a very small amount of it is that thick.

Q. How large have you seen the cakes in dimensions.

A. When they first move out they are quite large.

Q. Give an estimate of the size.

A. That depends from how far up the river they came; the first. ice that moves out is generally in quite large cakes, and when it comes down the river it is broken up so that it can go through the bridge.

Q. The more it has been traveling and the longer distance it has been traveling, it diminishes in size?

A. Yes, sir.

Q. How large cakes have you seen float down the river in places you have observed it?

A. I don't know; I can't say exactly; I have seen cakes float down that would not float through a bridge, but they were broken up as soon as they struck the ice breakers. In 1881 I was not on the bridge, in fact nobody was there; it didn't stop at the bridge, it went right on through the bridge.

Q. Is it not true, from your knowledge as an engineer, that a bridge, a pile bridge in the Platte river with twenty-foot spans has a tendency to stop the free flow of water and ice?

A. Yes, sir, if it is not cared for.

Q. But it has a greater tendency than one with forty-foot spans.

A. Yes, sir.

Q. In other words, the shorter the spans until you get out to certain lengths the greater liability there is for an obstruction.

A. Yes, sir, unless it is looked after.

Q. If it is looked after with men sufficient there to keep the ice going through and not allow it to accumulate, then it is all right and there is no obstruction?

A. There may be temporarily a stoppage of ice, but we have always managed to get it through.

Q. You always put a force of men there every spring of the year for the purpose of assisting the ice to flow through.

A. Yes, sir, we have at Oreapolis and Columbus.

Q. You do that because you regard the bridge as an obstruction that without them it would be very liable to form a gorge?

A. Yes, sir, and then for the safety of the bridge, because if it was allowed to gorge it would probably go out and travel be interrupted.

Q. In those matters you do that in considering the safety of your bridge and impeding the travel of the road?

A. Yes, sir.

Q. That is the particular object at those points.

A. Yes, sir.

Q. Now you say that safety and expense, among other matters, are taken into consideration in the construction of a bridge?

A. Yes, sir.

Q. Now if a 100-foot truss bridge is practicable with regard to safety, then is it not the reason why those pile bridges with twenty-foot spans are constructed because they cost less money, and can be built with less expense?

A. Not entirely; it costs less to maintain them and I consider them a very much safer structure ordinarily over the Platte river than a truss would be; that is, except two or three days in the spring when the ice is going out, they would not be relied upon as much as the truss bridge, but the labor that would be put on them at that time is saved the rest of the year on a pile bridge, because the trusses throughout the year need very much more care and more skill to look after them than a pile bridge.

Q. It resolves itself down to the question of expense and running of the road.

A. No, sir; I think there is a certain element of danger in a truss bridge, the top of a car may lop over so as to strike the truss and knock it down, or a piece of timber sticking out may catch a brakeman or somebody climbing down the side of the car.

Q. If a car should go off from the track on one of these stringer bridges it might go off from the bridge.

A. No, sir, not necessarily.

Q. It might not necessarily go off from the truss bridge?

A. It would necessarily injure the bridge more; it might not go off from the ties, but the top of the cars might lop over so as to hurt the truss and let the train down.

Q. You say a pile and stringer bridge would be practicable with the forty-foot spans.

A. Not a pile and stringer bridge.

In this he is corroborated by other witnesses called by the plaintiff in error.

George Smith, the county surveyor of Douglas county, Thomas Lee, bridge builder, and others, testify, in substance, that prior to the building of the bridge in controversy, and since the settlement of the state, floods had occurred on the Platte river in some cases covering the bottom lands, and that a bridge span of twenty feet from center to center "would have a tendency to gorge, dam up, and catch the drift."

These witnesses are objected to because of their lack of experience in building railroad bridges. Their testimony as experts on any question relating to that class of bridges probably would not be entitled to great weight, but, so far as they described the condition of the river at its various stages in different seasons of the year prior to 1876, they were testifying to facts. Some of these witnesses testify that when the river was breaking up it was no unusual thing for cakes of ice more than twenty feet square to pass down the river, and such cakes could not, unless broken up, pass through spans of a bridge where the spans were but twenty feet from center to center, and that thus there was a tendency by the accumulation of such cakes to form a gorge. This testimony is not seriously questioned. These facts were well known, or at least could have been ascertained by inquiry before and at the time the bridge was constructed,

and were sufficient to justify the jury in finding as they did in this case. The first bridge of the character of that in question seems to have been the one constructed by the Union Pacific Railway Company in 1868 across the North Platte river near its mouth. The next one was constructed by the Burlington & Missouri River Railroad Company in Nebraska in 1871 across the Platte river near Kearney. Both of these rivers seem to be shallow at the points where the bridges are built and hence but little trouble has been experienced with them, but we are led to infer that the case is different where narrow spans are used at all points below the confluence of the Loup river with the Platte— the river below that point being much deeper than above.

The last objection is that the verdict is against the clear weight of evidence, and this court is urged to set it aside on that ground. The Code has conferred upon both the district and supreme court power to review the facts in a case, and when it is apparent that the verdict is clearly wrong set it aside, and this court would be derelict in the performance of its duty if it failed in such a case to set the verdict aside. The testimony as to the cause of the gorge is of the most conflicting character. Nineteen witnesses called on behalf of the plaintiff below testified that about March 2, 1886, a gorge formed at the bridge in question and extended for a great distance up the river and that this gorge continued till about the 18th of that month. Some of these witnesses were sufferers from the overflow of the river, and have actions like those at bar pending against the company. This, however, merely affects their credibility, but the majority seem to have no interest in the result of the suit. More than twice this number of witnesses testify on behalf of the railway company that at the time stated there was no gorge at the bridge or for a considerable distance above it, and that during the time stated the water flowed free and unobstructed by ice near or at the bridge. A number of them testified that the

O. & R. V. R. Co. v. Brown.

gorge formed on some low islands in the river a short distance above the bridge, and in effect that the above islands caused the gorge.   It thus became the duty of the jury to scrutinize the testimony of each witness and ascertain from the evidence what his means of knowledge were, together with his apparent truthfulness and impartiality.   All the testimony shows that there was a gorge in the river at or near the bridge at the time stated and thereby the river bottom was overflowed in places to a great depth, and the conflict in the testimony is confined to the single point whether the gorge formed against the bridge or on the islands above the bridge.   It is clearly proved that the gorge was the cause of the overflow.   This question is not to be determined by the number of witnesses on a side, although in certain cases the number may be an important factor, but a verdict is to be arrived at from a consideration of all the testimony in the case, and no court, upon such testimony as is now before us, would be justified in setting the verdict aside.

Some objection is made that Annie E. Brown did not possess the legal title to forty acres in question that had been purchased from the Union Pacific Railway Company on credit, and that at the time of the overflow she was in default in her payments on the land, but that the contract had not been declared forfeited; that at the time of the trial she was not in default, and had paid all the purchase money then due.   This being the state of the proof, she was entitled to recover.   This question was very fully considered in *H. & G. I. R. Co. v. Ingalls*, 15 Neb., 123, and it was held that the purchaser could maintain the action, but that the holder of the legal title might be joined.   It would be very strange, indeed, if the purchaser of real estate, who in equity is treated as the owner, should be powerless to protect his rights in case his real estate, held under a valid contract, was injured, but such is not the law. (*Road v. N. Y. E. R. R. Co.*, 18 Barb., 80.)

33

The verdict in favor of Harrison Brown was for injuries to land, $1,000, and personal property, $275, and a like verdict was rendered in favor of Annie E. Brown. The damages, under the proof, are not excessive and there is no error in the record. The judgment is therefore affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.